# In the United States Court of Federal Claims

No. 13-719 C

(E-Filed: July 31, 2014)

| | |
|---|---|
| TIMOTHY J. HATMAKER, | ) |
| Plaintiff, | ) Military Pay; Physical |
| | ) Disability Board of Review |
| v. | ) (PDBR); Motion for Judgment |
| | ) on the Administrative Record; |
| THE UNITED STATES, | ) RCFC 52.1 |
| Defendant. | ) |
| | ) |

<u>Jason E. Perry</u>, Cheshire, Conn., for plaintiff.

<u>Devin A. Wolak</u>, Trial Attorney, with whom were <u>Stuart F. Delery</u>, Assistant Attorney General; <u>Robert E. Kirshman, Jr.</u>, Director; and <u>Steven J. Gillingham</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. <u>Todi Carnes</u>, Attorney, U.S. Air Force Litigation Division, of counsel.

## OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This is a military pay case in which plaintiff, Timothy J. Hatmaker (Mr. Hatmaker or plaintiff) seeks review of the decision of a military review board regarding the disability rating he received upon separation. Defendant is Mr. Hatmaker's former employer, the United States Air Force (Air Force or defendant). Mr. Hatmaker was separated from the Air Force in September 2007 after being found medically unfit by an Air Force Physical Evaluation Board (PEB). Mr. Hatmaker had one unfitting condition, vertigo, for which he received a disability rating of 10 percent. The PEB found that Mr. Hatmaker also had three other service related conditions, none of which were determined to be unfitting at the time of his separation.

Mr. Hatmaker sought review of the PEB decision from the Department of Defense (DoD) Physical Disability Board of Review (Board). In April 2013, the Board

recommended no change to the PEB decision.  Mr. Hatmaker now asks this court to review the Board's decision.

Pending before the court are the parties' cross-motions for judgment on the administrative record.  Both motions are ripe for consideration.  Oral argument was neither requested by the parties nor deemed necessary by the court.  For the reasons explained below,  defendant's motion for judgment on the administrative record is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Plaintiff's cross motion for judgment on the administrative record is **DENIED**.

As specified herein, this matter is **REMANDED** to the United States Department of Defense Physical Disability Board of Review for additional review.

I.     Background

Mr. Hatmaker was expected to be separated from the Air Force on May 31, 2007.  AR 78, ECF No. 12.  On May 23, 2007, Mr. Hatmaker had a medical assessment in connection with his expected separation.  AR 103-04.  During that assessment, Mr. Hatmaker indicated that his performance may have been affected by various medical disabilities, including sleep apnea and asthma.  AR 103, block 15.  On May 24, 2007, Mr. Hatmaker had a separation physical examination, AR 84-99, which showed that Mr. Hatmaker's medical conditions included asthma, obsessive compulsive disorder (OCD), vertigo, and obstructive sleep apnea, AR 84-85.

Mr. Hatmaker was then referred to a medical evaluation board (MEB).  AR 618.  The purpose of a MEB is to "document . . . the medical status and duty limitations of Service members referred into the [Department of Defense Disability Evaluation System]."  DoDI 1332.38[1] ¶ E3.P1.2.1.  The MEB convened on June 15, 2007, and concluded that Mr. Hatmaker's vertigo, asthma, obstructive sleep apnea, and OCD were potentially service disqualifying.  AR 76.  The MEB recommended referral of those conditions for review by an informal physical evaluation board (PEB).  Id.

The purpose of a PEB is to "determine the fitness of a Service members with medical impairments to perform their military duties; and for members determined unfit for duty-related impairments,  [to determine] their entitlement to benefits."  DoDI 1332.38 ¶ E3.P1.3.1.  An informal PEB "conduct[s] a documentary review without the presence of the Service member for providing initial findings and recommendations."  Id. at ¶ E3.P1.3.2.

---

[1]     U.S. Dep't of Def. Instruction (DoDI) 1332.38, Physical Disability Evaluation (Apr. 10, 2013).  DoDI 1332.38 implements policy and prescribes procedures for "[r]etiring or separating Service members because of physical disability."  DoDI 1332.38 ¶ 1.1.

<u>The Air Force's Physical Evaluation Board (Informal)</u>

On August 10, 2007, the PEB issued its "Findings and Recommended Disposition."  AR 43 (PEB decision).  The PEB considered the four potentially unfitting[2] conditions identified by the MEB, but found that only Mr. Hatmaker's vertigo was compensable and ratable.  <u>Id.</u>  The PEB found that Mr. Hatmaker's asthma, obstructive sleep apnea, and OCD were potentially unfitting, but were not currently compensable or ratable.  <u>Id.</u>

The PEB assigned Mr. Hatmaker a VASRD[3] diagnostic code for his vertigo which indicated a "[p]eripheral vestibular disorder."  <u>Id.</u>; <u>see also</u> 38 C.F.R. § 4.87 (2007)[4] (code 6204).  The PEB recommended that Mr. Hatmaker be medically separated from the Air Force with a disability rating of 10 percent for his vertigo.  AR 43.  Mr. Hatmaker waived his right to a formal PEB hearing.  AR 41.

Mr. Hatmaker was separated from the Air Force on September 24, 2007 due to disability.  AR 151.  At the time of his separation, Mr. Hatmaker was a captain and had completed approximately ten years of military service.  <u>Id.</u>

<u>Mr. Hatmaker's Application for Disability Benefits from the Department of Veterans Affairs</u>

After his separation from the Air Force, Mr. Hatmaker applied for benefits from the Department of Veterans Affairs (DVA).  <u>See</u> AR 152.  The DVA issued three decisions concerning Mr. Hatmaker.  In its first decision, issued on April 22, 2008, the DVA found there was a service connection for several of Mr. Hatmaker's disabilities, and provided the following disability ratings: obstructive sleep apnea (50 percent), OCD (10 percent), vertigo (0 percent).  AR 152-53.  The DVA also found several disabilities not at

---

[2]     "A Service member shall be considered unfit when the evidence establishes that the member, due to physical disability, is unable to reasonably perform [his or her] duties . . . ."  DoDI 1332.38 ¶ E3.P3.2.1.

[3]     Veterans Affairs Schedule for Rating Disabilities (VASRD), 38 C.F.R. pt. 4, is a "is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service."

[4]     DoDI 6044.44 requires the Board to review the service member's disability rating in accordance with the VASRD in effect at the time of separation.  DoDI 6040.44 encl. 3 ¶ 5.e.1.  Mr. Hatmaker was separated from the Air Force on September 24, 2007.  AR 151.  Accordingly, the court uses the VASRD in effect as of July 1, 2007.

issue in this case to be service connected, AR 153, and deferred a decision on whether there was a service connection for Mr. Hatmaker's asthma, AR 162.

On May 28, 2008, the DVA issued its second decision, in which it determined Mr. Hatmaker's asthma was service-connected, and granted him a 10 percent disability rating. AR 239.  On March 30, 2009, the DVA issued its third decision, in which it increased Mr. Hatmaker's disability rating for vertigo from 0 percent to 30 percent.  AR 247-49.

Plaintiff's Application to the Department of Defense Physical Disability Board of Review

A service member may apply to the Board for a review of the rating awarded in connection with a disability (or medical) separation from the military.  See 10 U.S.C. § 1554a (2012); DoDI 6040.44 ¶ 4.a.[5]  The purpose of a review by the Board is to "reassess the accuracy and fairness of the combined disability ratings assigned [to] Service members . . . [by] review[ing] the combined disability ratings . . . and, where appropriate, [by] recommend[ing] that the Military Departments correct discrepancies and errors in such ratings."  DoDI 6040.44 ¶ 4(a).

In September 2012, Mr. Hatmaker applied to the Board to review his August 2007 PEB decision.  AR 8-20 (Application for Board Review).  The Board issued its findings and recommendation on April 9, 2013.  AR 3-7.  In relevant part, the Board found that,

> [i]n the matter of the vertigo condition and [in accordance with] VASRD § 4.87 [code 6204], the Board unanimously recommends no change in the PEB adjudication.  In the matter of the contended OCD, asthma, and [sleep apnea] conditions, the Board unanimously recommends no change from the PEB determinations as not unfitting.

AR 7.

Plaintiff's Action before the Court of Federal Claims

Mr. Hatmaker filed a complaint in this court on September 24, 2013, in which he asserts that the Board's decision was arbitrary, capricious, contrary to law and regulations and unsupported by substantial evidence.  Compl. ¶ 18, ECF No. 1.  Mr. Hatmaker argues for an increased disability rating which would qualify him for a disability retirement, rather than the disability separation that he received.  Mr. Hatmaker seeks payment of the pay and benefits to which he would be entitled with a disability retirement.  Id. at ¶ 21; Id., prayer for relief.

---

[5]    DoDI 6040.44, Lead DoD Component for the Physical Disability Board of Review (PDBR) (June 2, 2009).

Defendant filed a motion for judgment on the administrative record on February 5, 2014.  Def.'s Mot., ECF No. 13.  That same day, defendant filed the Administrative Record.  AR, ECF No. 12.  Mr. Hatmaker filed his cross motion and response on March 11, 2014.  Pl.'s Mot., ECF No. 16.  Mr. Hatmaker also filed an appendix, listing "Evidence and References from the Administrative Record Referencing Vertigo."  Pl.'s App. A, ECF No. 16-1.  Defendant filed its response on April 2, 2014.  Def.'s Resp., ECF No. 23.  Mr. Hatmaker filed his reply on April 24, 2014.  Pl.'s Reply, ECF No. 26.

II.   Legal Standards

A.   Jurisdiction

A court must determine at the outset of a case whether it has subject matter jurisdiction over the claims put before it.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007).  The burden is on the plaintiff to show jurisdiction by a preponderance of the evidence.  Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002).

The United States Court of Federal Claims is a court of limited jurisdiction that, pursuant to the Tucker Act, may hear "any claim against the United States founded . . . upon . . . any Act of Congress or any regulation of an executive department."  28 U.S.C. § 1491(a) (2012).  The Tucker Act serves as a waiver of sovereign immunity and a jurisdictional grant, but it does not create a substantive cause of action.  Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).  A plaintiff must, therefore, satisfy the court that "'a separate source of substantive law . . . creates the right to money damages.'"  Id. (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part)).

Title 10 U.S.C. § 1201 requires the payment of disability retirement compensation once a service member's disability is found qualifying.  See 10 U.S.C. § 1201(a).  The Court of Appeals for the Federal Circuit has held that 10 U.S.C. § 1201 is a money-mandating statute.  See Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005).

As Mr. Hatmaker brought his claim under 10 U.S.C. § 1201 for monies he alleges are owed to him for a disability retirement, the court is satisfied it has jurisdiction over his claim.

B.   Judgment on the Administrative Record

Rule 52.1(c) of the Rule of the United States Court of Federal Claims (RCFC) provides for motions for judgment on the administrative record.  RCFC 52.1(c)(1) (providing that "a party may move for partial or other judgment on the administrative record").  A motion for judgment on the administrative record is "distinguish[able]" from

a motion for summary judgment in that there is no requirement that all material facts be undisputed. Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005). Judicial review of a military review board decision is conducted under the same standard as any other agency action, that is whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law. See Metz v. United States, 466 F.3d 991, 998 (2006); see also Silbaugh v. United States, 107 Fed. Cl. 143, 149 (2012) ("The court reviews the PDBR decision under a standard . . . [that does] not disturb the decision of the [board] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.") (internal quotation marks omitted) (last alteration in original).

When applying the substantial evidence standard of review, the court cannot substitute its judgment for that of the military review board. See Heisig v. United States, 719 F.2d 1153, 1156-57 (Fed. Cir. 1983) (stating that the court should not reweigh the evidence, but instead, should determine "whether the conclusion being reviewed is supported by substantial evidence" (emphasis omitted)). This court should not make independent factual assessments of medical evaluations or determine whether the military evaluation board came to the correct conclusion. Grooms v. United States, 113 Fed. Cl. 651 (2013) (citing Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009)). Nor is this court a "super correction board," with responsibility for determining whether a service member is fit or unfit to serve. Frey v. United States, 112 Fed. Cl. 337, 346 (2013) (quoting Skinner v. United States, 594 F.2d 824, 830 (Ct. Cl. 1979)).

When determining whether a decision of a military review board is supported by substantial evidence—or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal quotation marks omitted)—the court must consider "the record in its entirety, . . . including the body of evidence opposed to the Board's view," id. at 488.

III. Discussion

Mr. Hatmaker offers four arguments in support of his position that this court should not uphold the Board's decision not to recommend any change from the PEB decision. Mr. Hatmaker argues that the Board erred: (1) in not giving special consideration to the DVA rating; (2) in not reviewing Mr. Hatmaker's disabilities for their overall effect on his fitness; (3) by not considering a rating of total disability based on his unemployability; and (4) by failing to award a 30 percent rating for his vertigo.[6]

---

[6]     Mr. Hatmaker had argued initially that the Board applied incorrect, vague, and erroneous standards of proof when evaluating his claim, and he took particular exception to what he understood to be the Board's statement that the VASRD "resolution of reasonable doubt" rule did not apply in this case. Pl.'s Mot. 18-19 (citing 38 C.F.R. § 4.3). However, after considering defendant's thorough explanation of the differences between standards for fitness determinations and disability ratings, Def.'s Resp. 2-8, Mr.

Defendant asserts that each of the Board's decisions regarding plaintiff's (1) vertigo, (2) OCD, asthma, and sleep apnea, and (3) total disability due to unemployability, are correct.  Defendant urges the court not to disturb the Board's decision.

The parties agree that the scope of Mr. Hatmaker's claim before this court encompasses all of the complaints he may have had about the Board's recommendation to make no changes to the PEB's fitness determinations and disability ratings.  Def.'s Resp. 24; see Def.'s Mot. 24-26; Pl.'s Mot. 35-36.

The court considers the parties' arguments in the following order:  (1) the overall effect of Mr. Hatmaker's disabilities on his fitness determination; (2) Mr. Hatmaker's vertigo disability rating, including whether the Board was obligated to give special consideration to the DVA disability rating for vertigo; (3) Mr. Hatmaker's total disability due to unemployability, and (4) Mr. Hatmaker's OCD, asthma, and sleep apnea disability ratings.

A.     The Overall Effect of Mr. Hatmaker's Disabilities on His Fitness
       Determination

As permitted by the pertinent DoD instruction governing the evaluation of physical disabilities, a "member may be determined unfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the member to be . . . found unfit because of physical disability."  DoDI 1332.38 ¶ E3.P3.4.4.

Mr. Hatmaker alleges that the Board "erred by not reviewing [his] disabilities for [their] combined effect" on his fitness.  Pl.'s Mot. 22-24.  In his Application for Review, Mr. Hatmaker requested the Board to consider "that the combined effect of [his] sleep apnea, asthma, and OCD rendered him unfit to perform his duties."  AR 17.

The Board did acknowledge Mr. Hatmaker's request for an overall effect review in its decision.  AR 4.  But, the Board concluded that it lacked the authority to undertake such a review.

With regard to counsel's request for Board consideration of the DoDI 1332.38 principle of overall effect to achieve ratings of [Mr. Hatmaker's]

---

Hatmaker withdrew this challenge.  Pl.'s Reply 2.  Accordingly, the court gives no further consideration to this aspect of his claim.

Category II[7] conditions; the Board must heed the PEB's comments (Block 15, AF Form 356 dated 10 August 2007) that OCD, asthma, and sleep apnea were individually considered and individually determined to be not unfitting. <u>DoDI 6040.44 does not offer the latitude, explicit or implied, for the Board to consider individual conditions determined to be not unfitting by the PEB to be unfitting in the context of overall effect</u>; but rather, each condition so adjudicated by the PEB must be considered separately unfitting to be recommended for disability rating.

Id. (emphasis added) (footnote added) (citing AR 43).

The Board, however, was mistaken regarding the limit of its authority, as defendant concedes in its briefing. Def.'s Resp. 13-14. Defendant explains:

[T]he PDBR was technically incorrect in its statement that "DoDI 6040.44 does not offer the latitude, explicit or implied, for the Board to consider individual conditions determined to be not unfitting by the PEB to be unfitting in the context of overall effect . . . ." AR 4. . . . The regulation . . . provides that, "[a]s a part of its review, the PDBR may, at the request of an eligible member as provided for in Reference (b), review conditions identified but not determined to be unfitting by the PEB of the Military Department concerned." [DoDI 6040.44, Encl. 3 ¶ 1.] It also states:

The following will be subject to review by the PDBR: . . .
(b) Those instances when the covered individual requests the PDBR to review conditions identified but not determined to be unfitting by the PEB of the Military Department concerned. [DoDI 6040.44, Encl. 3 ¶ 5.e.(2)(b).]

Thus, the regulation permits the PDBR to review fitness determinations. Additionally, DoDI 1332.38 ¶ E3.P3.4.4 permits a PEB to conclude that two or more individually unfitting conditions have the "overall effect" of rendering the service member unfit to perform military duties.

Id. (some alterations in original).

Review of DoDI 6040.44 also shows that it expressly provides that PDBR operating procedures are to comply with DoDI 1332.38. DoDI 6040.44 Encl. 2 ¶ 6.h.

---

[7]      Category II conditions are those that can be unfitting, but are not currently compensable or ratable for the service member. AR 38.

Thus, as defendant recognizes, the relevant regulations make clear: (1) the Board did, and does, have authority to consider conditions not found to be unfitting by the PEB; (2) the Board, like the PEB, must consider such conditions according to DoDI 1332.38; and (3) under DoDI 1332.38 ¶ E3.P3.4.4, a service member may be found unfit as the result of the overall effect of more than one disability.

Defendant asserts, however, that the Board's failure to conduct on overall effect review in Mr. Hatmaker's case was a harmless error and as such, constitutes an insufficient ground for the court to disturb the Board's decision.  Def.'s Resp. 15 (citing Silbaugh v. United States, 107 Fed. Cl. 143, 154 (2012)).  Although defendant is correct that the doctrine of harmless error applies in military pay cases, see Christian v. United States, 337 F.3d 1338, 1343 (Fed. Cir. 2003) ("This court and its predecessor court have applied the harmless error analysis to military back pay cases."), the Court of Appeals for the Federal Circuit has also stated that not every error is amenable to harmless error review.

> Where reviewable standards or factors constrain the exercise of discretion, harmless error continues to be the appropriate test.  See, e.g., Carmichael [v. United States, 298 F.3d 1367, 1375-76 (Fed. Cir. 2002)] (remanding for evaluation of, inter alia, whether the Navy would have denied a serviceman's religious accommodation request under the factors set out by the Navy's accommodation procedures); Sargisson [v. United States, 913 F.2d 918, 922-23 (Fed. Cir. 1990)] (contrasting review of standardless discretionary decisions with review of compliance with statutory procedural requirements).  Where the effect of an error on the outcome of a proceeding is unquantifiable, however, we will not speculate as to what the outcome might have been had the error not occurred.

Wagner v. United States, 365 F.3d 1358, 1365 (Fed. Cir. 2004) (emphasis added).

In Wagner, the Federal Circuit declined to apply harmless error review to a case in which the Army committed a procedural error when it failed to secure the required approval from the Secretary of the Army before involuntarily discharging an officer from service.  Id. at 1360, 1365.  As the Federal Circuit explained, "a finding of harmlessness would require [the court] to approximate the absolute discretion afforded the Secretary of the Army on personnel matters with a determination of our own."  Id.  Such a determination would exceed the court's review authority.  See id.

For this court to find harmless error in the Board's failure to conduct an overall effect review of Mr. Hatmaker's disabilities, it would have to find that the Board would not have found Mr. Hatmaker unfit as a result of such a review.  Defendant endeavors to assure the court that this would have been the case.  Def.'s Resp. 16.  But, it is the

province of the Board—not this court, and not defendant—to determine Mr. Hatmaker's fitness.

The Federal Circuit has made clear that "[i]t is . . . settled that [the] responsibility for determining who is fit or unfit to serve in the armed services is not [within the] judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (footnotes omitted). Thus, this court may not make the determination inherent in the harmless error review, as defendant proposes.

The Board's refusal to conduct an overall effect review of Mr. Hatmaker's disabilities, as he requested, violated the written procedures under which the Board was obligated to conduct its review. See DoDI 6040.44, Encl. 3 ¶ 5.e.(2)(b); DoDI 1332.38 ¶ E3.P3.4.4. The pertinent regulations clearly outlined the PDBR's review protocol, and an agency is bound by its own regulations. Wagner, 365 F.3d at 1361 (citing, inter alia, Service v. Dulles, 354 U.S. 363, 388 (1957)). The Board erred in refusing to conduct an overall effect review of Mr. Hatmaker's disabilities, and that error may not be excused as harmless.

Moreover, the court has no authority to correct the Board's error through its own de novo review of Mr. Hatmaker's medical records. See Heisig, 719 F.2d at 1156. As the Supreme Court has explained:

> [i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); see also Rollock Co. v. United States, 115 Fed. Cl. 317, 334 (2014) (remanding case to the agency where it failed to consider all of plaintiff's claims).

The Court of Federal Claims has authority under the Tucker Act to remand a case to the PDBR. See 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); see also Martinez v. United States, 94 Fed. Cl. 176, 180 (2010) (remanding case to PDBR). Further to the rules of the court, the court may remand a case on its own initiative. RCFC 52.2(a) ("In

10

any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrative or executive body or official.").

Accordingly, the court remands this matter to the PDBR for consideration of Mr. Hatmaker's request to review the overall effect of his disabilities on his fitness determination.

B.    Vertigo Disability Rating

Mr. Hatmaker argues that the Board further erred when it declined to recommend an increase in his disability rating for vertigo from 10 percent to 30 percent. Pl.'s Mot. 19-21, 26-34. Mr. Hatmaker disagrees with the Board's findings on two grounds. First, he contends it failed to give appropriate consideration to the DVA disability rating for vertigo. Second, he asserts that the Board did not properly consider the evidence or appropriately apply the VASRD reasonable doubt rule, 38 C.F.R. § 4.3 (2007).

The court considers each argument in turn.

1.    DVA Disability Rating

Under DoDI 6040.44, the Board is required to consider a DVA disability rating for a condition that the PEB has found unfitting, such as Mr. Hatmaker's vertigo. The instruction provides in pertinent part:

> [T]he PDBR should compare any DVA disability rating for the specifically military unfitting condition(s) with the PEB combined disability rating and consider any variance in its deliberations and any impact on the final PEB combined disability rating, particularly if the DVA rating was awarded within 12 months of the Service member's separation.

DoDI 6040.44 encl. 3 ¶ 5.a.(4).

The DVA issued two decisions in which it rated Mr. Hatmaker's vertigo. In its first decision, issued on April 22, 2008, the DVA found a service connection for Mr. Hatmaker's vertigo, but granted him a disability rating of 0 percent. AR 153. In its third decision, issued on March 30, 2009, the DVA increased Mr. Hatmaker's disability rating for vertigo from 0 percent to 30 percent. AR 247. The DVA did not address vertigo in its second decision, which issued on May 28, 2008. AR 239-40.

Mr. Hatmaker argues that the Board erred by considering the evidence the DVA relied on when it assigned Mr. Hatmaker a 30 percent disability rating, rather than considering the DVA's disability rating itself. Pl.'s Mot. 20-21 ("[T]he special consideration is not as to evidence created within a 12 month separation period, but it is

rather to DVA ratings awarded within a 12 month post separation period."). Mr. Hatmaker further argues that the Board should have given "heightened deference" to the DVA disability rating, as DoDI 6040.44 directs the Board to "particularly" consider any variance between the PEB and DVA ratings if the DVA disability rating was "awarded within 12 months" of separation. Id. at 21.

Review of DoDI 6040.44 shows error in both of Mr. Hatmaker's arguments regarding the DVA disability rating, not in this aspect of the Board's consideration.

a.      Disability Rating Versus Evidence

Nothing in DoDI 6040.44 suggests that the Department of Defense intended the Board to consider the DVA disability rating, as Mr. Hatmaker asserts, in lieu of the evidence upon which the DVA based its disability rating. Instead, the instruction indicates that DoD had the contrary intention. DoDI 6040.44 contains numerous directions that task the Board with conducting a de novo review of the evidence before the PEB and the DVA, as well as a review of any other evidence presented to the Board. As provided in DoDI 6040.44,

> [t]he PDBR shall . . . impartially readjudicate cases upon which review is requested or undertaken on its own motion.

DoDI 6040.44 ¶ 4.b. Moreover,

> [t]he PDBR shall . . . [r]eview the PEB record of findings and the combined disability rating decisions regarding the specifically military unfitting medical conditions with respect to the covered individual. The review shall be based on the records of the Military Department concerned and such other evidence as may be presented to the PDBR, in accordance with the information requirements prescribed in paragraph 6.i. of Enclosure 2 and paragraph 5.a. of this enclosure.

Id. at encl. 3 ¶ 4.c.

Information required for the Board's review of cases includes, but is not limited to:

> (1) The complete record of medical and non-medical material and evidence contained in the Service member's PEB records that served as the basis for the original determination of unfitness and disability rating(s) assigned;
> (2) Rating determinations by the DVA, as applicable to the case under review; and

(3) New or newly discovered evidence not previously included in official records.

Id. at encl. 2 ¶ 6.i (emphasis added).

The Board discussed in its decision pertaining to Mr. Hatmaker how it would consider post-separation evidence, including evidence considered by the DVA.

> The Board utilizes DVA evidence proximal to separation in arriving at its recommendations; and, DoDI 6040.44 defines a 12-month interval for special consideration to post-separation evidence. The Board's authority as defined in DoDI 6040.4[4],[8] however, resides in evaluating the fairness of DES [Disability Evaluation System] fitness determinations and rating decisions for disability at the time of separation. Post-separation evidence therefore is probative only to the extent that it reasonably reflects the disability and fitness implications at the time of separation.

AR 4 (emphasis and footnote added).

As set forth in DoDI 6040.44, the Board was to consider the DVA "rating determinations," which it did. DoDI 6040.44 encl. 2 ¶ 6.i. The Board compared the PEB and DVA disability ratings in a side-by-side table of the disability ratings awarded for each of Mr. Hatmaker's disabilities, including vertigo. AR 4. The Board also described the various medical examination reports created during the DVA-arranged visits between January and February 2008. AR 5.

The Board then frankly discussed the "inconsistencies in the record," including the reports issued after three different DVA medical examinations. Id. These particular inconsistencies presented a "challenge[]" for the Board as it conducted its review. Id.

> [1] At the C&P exam [Mr. Hatmaker] indicated [his] symptoms had resolved, but at the [2] post-separation audiology evaluation he reported feeling unbalanced or dizzy "nearly all the time." Also, [Mr. Hatmaker] reported difficulty driving due to dizziness prior to separation, and informed VA examiners that this condition continued to prevent him from driving. Yet the MEB and [3] VA psychiatric reports strongly suggest that he was driving . . . .

Id. at 5-6 (emphasis and enumeration added). The Board clearly considered the

---

[8]     The Board cited to DoDI 6040.40, Military Health System Data Quality Management Control Procedures (Nov. 2002). This is evidently a typographical error that the court corrects here.

information in the DVA treatment record, and the Board's consideration of the DVA disability rating in this case was consistent with the consideration accorded in other cases. See, e.g., Petri v. United States, 104 Fed. Cl. 537, 567 (2012) (stating that the Board gave "attention to the VA examination reports upon which the VA rating was based").  To the extent, plaintiff asserts otherwise, he is in error, not the Board.

b.      Heightened Deference

Mr. Hatmaker also posits that the language in DoDI 6040.44 compelled the Board to "particularly" consider the DVA disability rating if it was "awarded within a 12 month post separation period."  Pl.'s Mot. 21.  But Mr. Hatmaker's argument misses the mark, because the DVA did not award his disability rating for vertigo within 12 months of his September 24, 2007 separation.  The DVA awarded Mr. Hatmaker a 30 percent disability rating for vertigo on March 30, 2009, AR 247, 18 months after his separation.  The DVA awarded the disability rating effective as of his separation date.  Id.  Thus under DoDI 6040.44 encl. 3 ¶ 5.a.(4), the Board was not required to "particularly" consider the DVA disability rating.  See, e.g., Petri, 104 Fed. Cl. at 567 (declining to provide particular consideration to the DVA disability rating where the service member's separation was on March 13, 2006 and the VA issued its disability rating more than 12 months later, on March 27, 2007).

Nevertheless, as discussed supra Part III.B.1.a., the Board did consider the DVA evidence in the record, and the court finds no error in the Board's consideration of the DVA disability rating.

2.      The Board's Review of Mr. Hatmaker's Vertigo Disability Rating

In determining whether there was substantial evidence to support the Board's decision not to increase Mr. Hatmaker's disability rating from 10 percent to 30 percent, the court must evaluate whether the Board considered the relevant information and whether the Board explained its decision.  Numerous courts have spoken to what a court needs to conduct its review of a board's decision.

A military review board "must examine relevant data and articulate satisfactory explanations for their decisions. This includes making rational connections between the facts found and the choices made."  Van Cleave v. United States, 70 Fed. Cl. 674, 679 (2006) (internal citation omitted).  "(T)he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."  Fed. Trade Comm'n v. Sperry & Hutchinson Co., 405 U.S. 233, 249 (1972) (internal quotation marks omitted).  "The . . . board's decision must also be sufficiently detailed for the court to ascertain the reasoning behind the denial of relief to the applicant."  Keller v. United States, 113 Fed. Cl. 779, 787 (2013), aff'd, No. 2014-5051, 2014 WL 1814016 (Fed. Cir. May 8, 2014).  "The court must be satisfied that the

Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it." Verbeck v. United States, 111 Fed. Cl. 744, 749 (2013) (internal quotation marks omitted).

"Even where the agency has failed to adequately support its interpretation, it is not for the Court to review de novo the agency's interpretation and guess at its supporting rationale, as the agency is better suited to understand the facts and reasons for its own interpretation." Towne v. United States, 106 Fed. Cl. 704, 713 (2012). But "[i]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). "In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it." Petri, 104 Fed. Cl. at 551.

In declining to increase Mr. Hatmaker's disability rating, the Board concluded that "[a]lthough the first neurology exam in May 2007 recorded complaints of staggering and dizziness, follow-up neurology visits noted dizziness to be at most occasional; and staggering was not reported again. And finally, physician examinations consistently documented the absence of any objective findings of disequilibrium." AR 6.

As discussed more fully below, the court is not satisfied that the Board has provided a sufficient explanation for its decision from which the court can evaluate whether the Board's decision was supported by substantial evidence. More particularly, the court cannot "evaluate the challenged agency action on the basis of the [decision] before it." Fla. Power & Light Co., 470 U.S. at 744.

a.    Dizziness

The Board concludes that Mr. Hatmaker's episodes of dizziness were "at most occasional," id., which satisfies the VASRD requirement for a 10 percent disability rating, but not that for a 30 percent disability rating. The VASRD does not define the difference between occasional dizziness and dizziness. See 38 C.F.R. § 4.87 (code 6204). Nor does the Board discuss what is necessary for a finding of dizziness, or the lesser finding of occasional dizziness.

The Board examined what the record showed regarding dizziness. The Board noted that:

> at the June 2007 neurology follow-up visit [AR 325], [Mr. Hatmaker] stated that [his] vertigo was completely resolved and there was no dizziness. At the final neurology visit in evidence 2 months prior to

separation, [on July 10, 2007, AR 356,] he stated that [this] dizziness was intermittent.   At the C&P exam [, on January 24, 2008, AR 185,] he indicated [his] symptoms had resolved, but at the post-separation audiology evaluation [that same day, AR 166-67,] he reported feeling unbalanced or dizzy "nearly all the time."   Also [Mr. Hatmaker] reported difficulty driving due to dizziness prior to separation, and informed [the] VA examiners [during his C&P visit on January 24, 2008, AR 207] that this condition continued to prevent him from driving.   Yet the MEB [visit on June 13, 2007, AR 81-83,] and VA psychiatric reports [, dated February 2, 2008, AR 171-80] strongly suggest[ed] that he was driving and that it was his mental condition that caused some issues with driving (although not an inability to drive).

AR 5-6 (emphasis added).

Omitted from the Board's discussion, however, was any mention of Mr. Hatmaker's documented absence from work due to dizziness, and any explanation regarding why the Board chose to credit general discussions of symptoms for his OCD, rather than Mr. Hatmaker's repeated reports that he was not driving due to dizziness.

i.      Absence from Work

Although, there are several reports in the record for the period of time between June and July 2007 that Mr. Hatmaker was absent from work due to his vertigo, the Board made no reference to these reports.

The record reflects that on June 11, 2007, Mr. Hatmaker's neurologist reported that "[h]is vertigo is completely resolved, with no dizziness, BUT, he continues to have unsteadiness and feels 'off.'  His nausea is much improved; [yet] [h]e remains on short term leave from work." AR 325 (emphasis added).  Mr. Hatmaker returned to his neurologist on July 10, 2007, with the following update:  "He has been using the [s]copolamine patch, which he finds very beneficial.  Overall, he feels better, although he continues to have intermittent dizziness.  He is still unable to drive.  He has not returned to work due to the dizziness." AR 356 (emphasis and footnote added).  The neurologist observed that "[i]t is difficult to estimate a 'return to work' date[].  I am hopeful that once he starts vestibular therapy, the recovery process will be hastened."  Id. (emphasis added).

Mr. Hatmaker's noted absence from work was confirmed by his commanding officer in a statement he provided to the MEB.  AR 372.  As of June 13, 2007, Mr. Hatmaker had "missed 48 days within the past 90 days which were physician directed." Id. (emphasis added).

16

As informed by the neurologist's July 10, 2007 notes—the last date for which information is in the record prior to the August 10, 2007 PEB—Mr. Hatmaker was continuously absent from work between mid-June and mid-July 2007.  In evaluating whether the record showed that Mr. Hatmaker's dizziness was merely occasional, the court cannot discern why the Board chose not to address the impact on its decision of Mr. Hatmaker's well-documented and extended absence from work—which his neurologist attributed "to . . . dizziness," AR 356, and his commanding officer acknowledged was "physician directed," AR 372.

ii.   Driving

As Mr. Hatmaker points out in his briefing, the Board seemed to associate his inability to drive with his OCD, rather than with his vertigo.  Pl.'s Reply 6.  But in discussing his OCD, the Board failed to draw the same conclusion.  Id.  Mr. Hatmaker asserts that the PDBR cannot have it both ways; it cannot attribute his driving disability to one condition (his OCD) for the purpose of discounting the impact of his vertigo on his driving difficulties, and then not consider its own findings regarding his OCD when addressing his driving limitations.  Id.  Mr. Hatmaker is correct that when the Board discussed his OCD, it acknowledged that "[t]he psychiatrist noted no significant impairment with work or driving."  AR 6.  Yet, for reasons that are not entirely clear to the court, the Board associated Mr. Hatmaker's driving difficulties principally with his OCD.

The record contains several explicit statements that Mr. Hatmaker was not driving due to his dizziness.  In a June 13, 2007 statement given to the MEB, Mr. Hatmaker's commanding officer stated that "a vertigo condition ha[d] limited [Mr. Hatmaker] from being able to drive."  AR 372.  In a July 5, 2007 testing appointment ordered by his neurologist, Mr. Hatmaker self-reported that he "ha[d] discontinued driv[ing]."  AR 357.  During his July 10, 2007 neurology appointment, Mr. Hatmaker again reported that "he [was] still unable to drive."  AR 356.  Subsequently after his separation from the service, Mr. Hatmaker reported during a February 2, 2008 mental health examination that "he cannot drive with vertigo."  AR 174.  The examining doctor during that visit regarded Mr. Hatmaker as "a reliable historian for purposes of th[e] examination."  AR 171.

While the Board acknowledged some of these representations, the Board focused on statements contained in two mental health records, respectively dated June 2007 and February 2008, concerning Mr. Hatmaker's OCD and his driving.

From the MEB psychiatry consultation record, dated June 13, 2007, the Board recognized that Mr. Hatmaker "periodically wondered [while driving] 'if he ha[d] run over anything."  AR 5 (quoting AR 81).  Although the record showed Mr. Hatmaker's continued "anxiety regarding others' opinions of him" and his periodic worry about running over things, AR 81, the record did not indicate whether, at that time, Mr.

Hatmaker was still driving.

The Board also described in some detail, in its review of a post-separation February 2, 2008 mental health examination, the checking behavior that Mr. Hatmaker exhibited in connection with his OCD; that checking behavior involved a compulsive need to retrace his path to satisfy himself that he had not accidentally hit someone or something while driving. AR 5 (citing 175-76). During that mental health examination, Mr. Hatmaker also reported that "he [could not] drive with vertigo." AR 174.

From these reports, the Board found a "strong[] suggest[ion] that [Mr. Hatmaker] was driving and that it was his mental condition that caused some issues with driving (although not an inability to drive)." AR 5-6.

When conducting its review of the Board's decision, "[t]he court must be satisfied that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it." Verbeck, 111 Fed. Cl. at 749 (internal quotation marks omitted). Here, the Board's reasoning seems to have gaps and the court is unable to discern, and thus improperly would have to infer, the Board's rationale. Of specific concern to the court is the Board's omitted mention of, and lack of explanation for, the diminished weight it appears to have given to certain relevant and informative evidence, namely Mr. Hatmaker's documented absences from work due to dizziness. Nor does the Board's decision clarify what it needed for a finding of dizziness, rather than occasional dizziness. Absent any guidance on the subject of the difference between occasional dizziness and dizziness, and a discussion of how the Board viewed the, at times, conflicting elements of the evidence, the court is unable to determine whether the Board's decision concerning Mr. Hatmaker's dizziness was supported by substantial evidence.

### b.    Staggering

The Board concluded that "staggering" was not reported in the medical records after May 23, 2007. AR 6 (citing AR 323). A 30 percent disability rating requires "occasional staggering." 38 C.F.R. § 4.87 (code 6204).

The medical records show, however, that Mr. Hatmaker continued to have unsteadiness after May 2007. During a June 11, 2007 neurology appointment, the doctor recorded, "[h]is vertigo is completely resolved, with no dizziness, BUT, he continues to have unsteadiness and feels 'off.'" AR 325. During a July 5, 2007 appointment for an additional neurologic evaluation, Mr. Hatmaker reported that "he continue[d] to feel unsteady with no vertigo." AR 357. And finally, during a July 16, 2007 physical therapy appointment, Mr. Hatmaker was evaluated as walking "with difficulty." AR 355.

The Board appears to have drawn a distinction between staggering and either

18

unsteadiness or walking with difficulty, and thus credited only those medical records expressly reporting the symptom of staggering as supportive evidence for the 30 percent disability rating it accorded under 38 C.F.R. § 4.87 (code 6204). Unclear to the court from the record before it is whether reports of staggering and unsteadiness are materially different for the purpose of determining disability ratings. The dictionary upon which defendant relies in making another argument in this case, see infra Part III.B.2.c., defines stagger to mean "mov[ing] or caus[ing] (someone) to move unsteadily from side to side." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/stagger (last visited July 30, 2014). If this definition is appropriate here, Mr. Hatmaker conceivably may have exhibited symptoms of staggering. The court does not purport to decide this issue; rather the court observes that without an explanation of why the Board credited only reports that expressly used the term "stagger," it is unable to determine whether substantial evidence supported the Board's decision that Mr. Hatmaker did not show occasional staggering, as required for a 30 percent disability rating.

c.      Objective Findings of Disequilibrium

According to the Board, the "physician[s'] examinations consistently documented the absence of any objective findings of disequilibrium" for Mr. Hatmaker. AR 6. The Board did not indicate whether it was referring specifically to objective findings of dizziness, staggering, or both. Plaintiff points to a neurologic medical record in which he was diagnosed with "'a vestibular etiology for his dizziness'" as objective evidence of a finding of disequilibrium. Pl.'s Mot. 26-27 (quoting AR 55). Defendant challenges Mr. Hatmaker's effort to equate disequilibrium with dizziness; defendant asserts that disequilibrium is defined as "a loss or lack of balance," and is distinguishable from the sensation of dizziness. Def.'s Resp. 23 n.8 (quoting www.merriam-webster.com).

Whether defendant's definition of disequilibrium is the same as the definition employed by the Board is not discernable from the record. A widely-used medical dictionary does define disequilibrium as "any derangement of the sense of equilibrium [to include] . . . dizziness and vertigo." Dorland's Illustrated Medical Dictionary 577 (32d ed. 2012).

If the Board did apply the definition proposed by defendant, it is not clear that the medical records in evidence support the Board's assessment that "objective findings of disequilibrium" were absent. The Board appears to have omitted any discussion of one specific medical record, a July 16, 2007 initial evaluation of Mr. Hatmaker by a physical therapist that was prompted by his vertigo, AR 353-55; that record makes reference to difficulties Mr. Hatmaker experienced that could be consistent with a finding of disequilibrium. As reflected in the medical record, the physical therapist evaluated Mr. Hatmaker's ability to ambulate on both even terrain and uneven terrain, and described his ability as "[i]ndependent with difficulty." AR 355. He was noted to be able to walk about 180 feet on even terrain, and 35 feet on uneven terrain. Id. The goals for Mr.

Hatmaker were to be able to walk independently (without difficulty) on both types of terrain, for a distance greater than 500 feet on even terrain, and an unlimited distance on uneven terrain. Id. Although a review board is not required to discuss every medical record in evidence, Rebosky v. United States, 60 Fed. Cl. 305, 312 (2004), the Board's failure to discuss this relevant medical record that potentially contravenes the Board's finding is not readily understood and has not been explained.

The record of that July 16, 2007 physical therapy evaluation is Mr. Hatmaker's last medical evaluation prior to his August 10, 2007 PEB. See Pl.'s App. A 2. The purpose of the office visit was to treat Mr. Hatmaker's vertigo. AR 353 (Physical Therapy Diagnosis: Vertigo). The Board's silence on this record is puzzling because it has considered every other medical record for Mr. Hatmaker between March 2007 and August 2007, including the ones related to his vertigo and those related to his other disabilities. Compare AR 4-5, with Pl.'s App. A 1-2. The Board also discussed the January and February 2008 medical evaluations conducted for the DVA Compensation and Pension (C&P) evaluation. See AR 5.

On review the court finds the record to contain a document that speaks to Mr. Hatmaker's difficulty walking on various surfaces, but no discussion by the Board regarding its significance, if any. Without further explanation of what the Board meant when it pronounced its finding of an "absence of any objective findings of disequilibrium," the court cannot determine whether the Board's decision is supported by substantial evidence. Thus, the court remands the matter to the Board for consideration of all the evidence regarding Mr. Hatmaker's vertigo, and for an explanation of the decision it reaches.

### 3. Remarks Regarding Remand

Because the court is remanding this matter to the Board for further consideration, it does not consider Mr. Hatmaker's argument regarding the Board's application of the VASRD reasonable doubt rule. Pl.'s Mot. 28-32 (citing 38 C.F.R. § 4.3).

Two additional matters that might be considered on remand include the following. the first matter involves a February 2008 physical therapy record. Mr. Hatmaker faults the Board for not considering the February 9, 2008 physical therapy treatment report considered by the DVA. Id. at 32-33. He expresses concern that the text of the Board's decision refers to "a post separation physical therapy note that stated he experienced episodes of dizziness and staggering;" that note is followed by a parenthetical that documents the date of the therapy as February 2008, and observes that the note is "not in evidence." AR 5. Mr. Hatmaker does not dispute that the February 2008 physical therapy report was not before the Board. Pl.'s Mot. 33. And the Board did not indicate whether it considered the DVA's report of the February 2008 physical therapy note. For the sake of record completeness, Mr. Hatmaker may renew his request, on remand, that

the record be provided to the Board.  See DoDI 6040.44 encl. 2 ¶ 6.i; AR 20.

The second matter involves Mr. Hatmaker's active medication list.  The court's record review has revealed a discrepancy regarding Mr. Hatmaker's prescriptions that merits attention.  Based on its review of the January 2008 DVA C&P exam, the Board accurately observed that Mr. Hatmaker's "active medication list included no medications for vertigo or dizziness."  AR 5 (citing AR 186).  But identified during Mr. Hatmaker's evaluation for vertigo—which was conducted as part of the same DVA C&P exam— were two medications for the treatment of vertigo, specifically a "scopolamine patch [and] meclizine."  AR 185.  In addition, earlier records showed that Mr. Hatmaker had been prescribed a scopolamine patch for the "control of vertigo symptoms."  AR 356 (July 10, 2007 neurology appointment).  No explanation can be found in the record regarding why the medication prescribed to Mr. Hatmaker was not included in the active medication list.  But, more importantly, the court cannot determine from the record what, if any, impact the Board's awareness (or lack thereof) of plaintiff's vertigo medication had on its decision.

C.     Total Disability Due to Unemployability

Mr. Hatmaker requested that the PDBR consider his conditions "for a total rating for unemployability, [an evaluation, he believes would have] result[ed] in an award of 100% disability."  AR 14.  Mr. Hatmaker asserts that he was entitled to be considered for a total disability rating under both DoDI 1332.39[9] ¶ 6.5 and 38 C.F.R. § 4.16 (2007). Pl.'s Mot. 24-26; Pl's Reply 16-18.

While Mr. Hatmaker is correct that a service member may be awarded a total disability rating based on his inability to secure a substantially gainful occupation, due to his unemployability, the VASRD provides clear thresholds for such a rating.  Under 38 C.F.R. § 4.16, a service member with one service-connected disabling condition may only be considered for a total disability rating if that disabling condition is ratable at 60 percent or more.  38 C.F.R. § 4.16(a) (2007).

Under DoDI 1332.39 ¶ 6.5, however, there is no similar threshold.  "[I]in cases in which the VASRD does not provide a 100 percent rating under the appropriate (or analogous) code, a member may be assigned a disability rating of 100 percent if the member's impairment is sufficient to render it impossible to engage a substantially gainful occupation."  DoDI 1332.39 ¶ 6.5.

Mr. Hatmaker's one service-connected disabling condition is vertigo.  AR 43 (PEB decision); AR 7 (PDBR Recommendation).  Vertigo is ratable at either 10 percent

---

[9]     DoDI 1332.39, Application of the Veterans Administration Schedule for Rating Disabilities (Nov. 14, 1996).

or 30 percent.  38 C.F.R. § 4.87 (code 6204).  Because vertigo is not ratable at 60 percent or more, Mr. Hatmaker could not qualify for total disability under 38 C.F.R. § 4.16, but under certain circumstances, he could qualify for such a rating under DoDI 1332.39 ¶ 6.5.

The problem for Mr. Hatmaker, however, is that the Department of Defense rescinded DoDI 1332.39, and it was not applicable to the Board's review of his case.  The court first addresses, for the sake of clarity, the inapplicability of DoDI 1332.39 to the Board's review, and then considers the parties' arguments under 38 C.F.R. § 4.16.

        1.      Inapplicability of DoDI 1332.39 to the Board's Review

On June 2, 2009, "Change 1" was incorporated into DoDI 6040.44, which expressly provides that DoDI 1332.39 does not apply to the Board's review of a service member's disability rating if that service member was separated from the military prior to January 28, 2008.[10]  DoDI 6040.44 encl. 3 ¶ 5.e.1.  The relevant text is included below, with the text newly added in "Change 1" denoted by italics, and the deleted text denoted by strike throughs.

> If the case was adjudicated by the final Military Department PEB and the covered individual was separated from military service prior to January 28, 2008, the PDBR shall also review the disability rating(s) of the covered individual, in accordance with ~~the DoD application of~~ the VASRD ~~under DoDI 1332.39 (Reference (m)) and applicable Service regulations, if any,~~ in effect at the time of separation for the covered individual.  *Provisions of DoD or Military Department regulations or guidelines relied upon by the PEB will not be considered by the PDBR to the extent they were inconsistent with the VASRD in effect at the time of the adjudication.*

DoDI 6040.44 encl. 3 ¶ 5.e.(1).

Mr. Hatmaker was separated from military service on September 24, 2007. AR 151.  Hence under DoDI 6040.44, the Board was to review his disability rating

---

[10]    The Department of Defense rescinded DoDI 1332.39 on October 14, 2008.  David S.C. Chu, Office of the Under Sec'y for Pers. & Readiness, U.S. Dep't of Def., <u>Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008 (Pub L. 110-181)</u> 1 (Oct. 14, 2008) ("DoD Mem."), http://prhome.defense.gov/Portals/52/Documents/WCP%20Documents/NDAA%2008%2 02%20PM%2sm.pdf.  <u>See also</u> DoD Mem. attach. 1 ("The policies below . . . <u>rescind</u> DoDI 1332.39, Application of the Veterans Administration Schedule for Rating Disabilities, November 14, 1996.").

under only the VASRD.  DoDI 6040.44 encl. 3 ¶ 5.e.(1).

DoDI 6040.44 provides that the PDBR was permitted to consider regulations or guidelines relied upon by the PEB, in certain circumstances.  Id.  Such permissive consideration would not have extended to DoDI 1332.39.

It is unclear whether the PEB did rely on DoDI 1332.39 ¶ 6.5 during its August 2007 evaluation of Mr. Hatmaker.  Although this instruction still would have been in effect, the Board expressed doubt that the PEB considered this, or any other instruction, stating that it "[had] not surmise[d] from the record or PEB ruling in this case that any prerogatives outside the VASRD were exercised."  AR 7.

Whether or not the PEB actually relied on DoDI 1332.39 ¶ 6.5, the Board was not permitted to consider Mr. Hatmaker's claim under DoDI 1332.39.  DoDI 6040.44 encl. 3 ¶ 5.e.(1).  The two regulations, DoDI 1332.39 ¶ 6.5 (the departmental instruction still in effect) and 38 C.F.R. § 4.16(a) (the operative VASRD), were not consistent on the issue of whether a service member with one service-connected disabling condition that is ratable at less than 60 percent, like Mr. Hatmaker, might be rated as totally disabled due to unemployability.  Because DoDI 1332.39 ¶ 6.5 was "inconsistent with the VASRD in effect at the time of the adjudication," id., the Board was precluded from relying on DoDI 1332.39 in its review.

Although he was aware that the Department of Defense had rescinded DoDI 1332.39, Mr. Hatmaker nonetheless argued to the Board that 38 C.F.R. § 4.16 was "in harmony" with DoDI 1332.39 and thus he urged the Board to consider his claim under DoDI 1332.39.  AR 17 (citing DoDI 6040.44 ¶ 5.e.(1)).

Mr. Hatmaker has made no similar argument before this court.  But, as discussed more fully above, DoDI 1332.39 ¶ 6.5 and 38 C.F.R. § 4.16(a) are not consistent on the issue of the unemployability of a member with one service-connected disabling condition that is ratable at less than 60 percent.  Because any contention otherwise is incorrect, the court does not consider the parties' unemployability arguments based on DoDI 1332.39.

2.      The Board's Review Under 38 C.F.R. § 4.16

The court does consider the parties' arguments based on 38 C.F.R. § 4.16.  That regulation is excerpted in relevant part below.

Total disability ratings for compensation may be assigned, where the schedular rating is less than total, when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities: Provided [t]hat, if there is only one such disability, this disability shall be ratable at

60 percent or more, and that, if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more.

38 C.F.R. § 4.16(a).

Because Mr. Hatmaker's vertigo is ratable at no more than 30 percent, he fails to qualify, under 38 C.F.R. § 4.16(a), for consideration of total disability due to unemployability.

Nonetheless, Mr. Hatmaker requested review of his rating determination.  In response to his request, the Board explained that a determination of total disability due to unemployability was a "consequential entitlement determination," that fell within the province of the Secretary of the Air Force.  AR 3.  The Board specifically stated,

> [i]t is noted that the applicant asks the Board for . . . specified consequential entitlements of 100% disability.  By law the Board authority is limited to making recommendations on correcting disability determinations.  The actual . . . consequential entitlement determinations [are] the responsibility of the applicable Secretary and Accounting service.

Id. (emphasis added).

Notwithstanding the Board's response, Mr. Hatmaker argues that the Board erred in not considering his claim for a total disability rating.  Pl.'s Mot. 24-26; Pl.'s Reply 14-20.  Mr. Hatmaker evidently believes that the Board's brief statement was inadequate to serve as consideration of his claim.  See Pl.'s Mot. 24.

Defendant contends that the Board's statement that "total disability is a 'consequential entitlement'" is a correct one, and sufficed as a response to Mr. Hatmaker's request.  Def.'s Resp. 20-21 (quoting AR 3).

Mr. Hatmaker characterizes defendant's explanation as a post-hoc rationalization, because the Board did not point explicitly to the 60 percent threshold set forth in 38 C.F.R. § 4.16 as the reason for not engaging in further review of Mr. Hatmaker's claim.  See Pl.'s Mot. 24-25.  Mr. Hatmaker urges the court to reject defendant's rationalization as impermissible.  Id. at 25 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168-69 (1962) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action; [SEC v. Chenery Corp., 332 U.S. 194 (1995)] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself . . . .")).

Plaintiff's argument goes too far.  The Board has articulated with sufficient clarity

24

the basis for its decision.  But, even if the Board's decision was not a model of clarity on this issue, the court must stay its hand if the Board's decisional path can "reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (citing Colo. Interstate Gas Co. v. Fed. Power Comm'n, 324 U.S. 581, 595 (1945) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.")).

The Board has a duty to review a service member's disability rating, and where appropriate, "recommend that the Military Departments correct discrepancies and errors in such ratings."  DoDI 6040.44 ¶ 4.a.  Because 38 C.F.R. § 4.16(a) governs total disability ratings based on unemployability, and provides thresholds for such a rating, the Board clearly and properly limited its review of Mr. Hatmaker's case and explained that the disability rating was a "consequential entitlement determination" to be made by the appropriate Secretary.

The court finds that the Board committed no error in its decision regarding Mr. Hatmaker's request to be rated as 100 percent disabled based on unemployability.

D.      OCD, Asthma, and Sleep Apnea Disability Ratings

Defendant argued that the Board was correct in its decision to make no changes to the PEB decision that Mr. Hatmaker's OCD, asthma, and sleep apnea were not unfitting disabilities.  Def.'s Mot. 29-32.

In his response to defendant's argument, Mr. Hatmaker did not assert that the Board had committed an error in its review of these disabilities.  See Pl.'s Mot. 38.  Rather, he challenged defendant's argument before this court that he had accepted the August 2007 PEB decision that his OCD, asthma, and sleep apnea were not unfitting.  Id. (citing Def.'s Mot. 32).

In its motion before this court, defendant contended that "at the time contemporaneous with his separation, Mr. Hatmaker expressly agreed with the PEB that these three conditions were not unfitting."  Def.'s Mot. 32 (citing AR 43, block 15; AR 41 § 4).  As reflected in the record, the PEB stated that "the sleep apnea and asthma are not unfitting. . . .[and] [i]mpairment from your OCD is Mild, indicating that it is not unfitting."  AR 43.

The PEB decision indicates that Mr. Hatmaker checked a box that said "I agree with the Findings and Recommended Disposition of the PEB and understand I am waiving the right to a formal PEB hearing."  AR 41.  He then signed his name as a supplementary indication of his agreement with that statement.  Id.

The record makes clear that the Board did not consider Mr. Hatmaker's

acceptance of the PEB decision in its review of his OCD, asthma, and sleep apnea claims. AR 6-7.  Because the court reviews the Board's decision, and does not accept defendant's counsel's arguments as dispositive, no further discussion of Mr. Hatmaker's acceptance of the August 2007 PEB decision is necessary.

Mr. Hatmaker alleged no other error in the Board's review of his OCD, asthma, or sleep apnea, and the court finds no error with the Board's decision to make no changes to the PEB fitness determinations for Mr. Hatmaker's OCD, asthma, or sleep apnea.

IV.    Conclusion

The court **GRANTS** defendant's motion for judgment on the administrative record for the issues of (1) OCD, asthma, and sleep apnea, and (2) total disability due to unemployability.  Defendant's motion is otherwise **DENIED**.  Plaintiff's cross motion for judgment on the administrative record is **DENIED**.

Pursuant to its authority under 28 U.S.C. § 1491(a)(2), the court **REMANDS** this matter to the United States Department of Defense Physical Disability Board of Review for additional review, as specified below.

The Physical Disability Board of Review shall consider Mr. Hatmaker's request to review the overall effect of his disabilities on his fitness determination.

In addition, the Physical Disability Board of Review shall review the PEB decision assigning Mr. Hatmaker a 10 percent disability rating for vertigo.  As more fully explained in this opinion, the Physical Disability Board of Review shall consider all the relevant evidence in the record and provide an explanation for its decision sufficient for this court to conduct a review, if necessary.

In particular, the Physical Disability Board of Review shall provide an explanation of the showing needed to satisfy a finding of dizziness, rather than occasional dizziness. The Physical Disability Board of Review shall address the evidence that Mr. Hatmaker was absent from work due to dizziness.  The Physical Disability Board of Review shall provide an explanation of why it credited post-separation discussions by Mr. Hatmaker of OCD symptoms as providing a stronger indication of whether Mr. Hatmaker was driving, at the time of separation, than express statements Mr. Hatmaker made during June and July 2007.  The Physical Disability Board of Review shall provide an explanation for whether it considers reports of unsteadiness or difficulty walking as evidence to be considered in evaluating whether Mr. Hatmaker showed occasional staggering.  The Physical Disability Board of Review shall explain its statement that "physician examinations consistently documented the absence of any objective findings of disequilibrium."  AR 6.  And the Physical Disability Board of Review shall address the significance of Mr. Hatmaker's vertigo medication during his January 2008 DVA C&P

examination.

Moreover, Mr. Hatmaker should be provided an opportunity to add the February 9, 2008 physical therapy report to the record in this matter.

This case shall be **STAYED** pending remand.  <u>See</u> RCFC 52.2(b)(1)(C).  The remand shall last no longer than six months, RCFC 52.2(b)(1)(B), and the parties shall file joint status reports every ninety days informing the court of the status of the remand, RCFC 52.2(b)(1)(D).  **Accordingly, joint status reports shall be due no later than October 31, 2014 and January 30, 2015.**  "The results of the proceedings on remand are subject to this court's review," <u>Santiago v. United States</u>, 71 Fed. Cl. 220, 230 n.17 2006).

IT IS SO ORDERED.

<u>s/ Patricia E. Campbell-Smith</u><br>
PATRICIA E. CAMPBELL-SMITH<br>
Chief Judge
